IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **J.D. HEISKEL HOLDINGS, LLC,** | |
| **Plaintiff,** | **8:14CV277** |
| **vs.** | |
| **TRANS COASTAL SUPPLY CO., INC.,** | **MEMORANDUM AND ORDER** |
| **Defendant.** | |

This matter is before the Court on the Motion to Dismiss (Filing No. 14) filed by Defendant Trans Coastal Supply Co., Inc. For the reasons stated below, the Motion will be granted, and this case will be dismissed for lack of personal jurisdiction.

## FACTUAL BACKGROUND

### A.      Nature of the Dispute

This case arises out of a dispute over contracts between J.D. Heiskel Holdings, LLC ("JDH") and Trans Coastal Supply Co., Inc. ("Trans Coastal") for the sale of an ethanol by-product known as dried distiller's grain with soluables ("DDGS"). (Compl., Filing No. 1 ¶¶ 6-14.)  JDH is a Nebraska limited liability company with its principal place of business in Tulare, California, and its chief trading office in Elkhorn, Nebraska.  (*Id.* ¶ 1.) JDH is engaged in the grain and commodity trading business and conducts a livestock feed manufacturing operation. (*Id.* ¶ 6.)  JDH has regularly sold and distributed DDGS to companies throughout the United States, including Trans Coastal.  (*Id.*)  Trans Coastal is an Illinois corporation with its principal place of business in Decatur, Illinois. (*Id.* ¶ 2.)  Trans Coastal is engaged in the agribusiness industry as an exporter of agricultural commodities including DDGS. (*Id.* ¶ 7.)

On or about December 11, 2013, JDH and Trans Coastal entered into Contract 185052 for the sale and shipment of approximately 4,200 tons of DDGS.  (*Id.* ¶ 8.)  The following year, on or about July 22, 2014, JDH and Trans Coastal entered into Contract 83114 wherein the parties agreed that JDH would ship and sell approximately 20,000 tons of DDGS to Trans Coastal.  (*Id.* ¶ 9.)  After completing the shipments, JDH sent Trans Coastal an A/R Customer Acknowledgement form to collect the balance due under Contract 83114 and Contract 185052.  (*Id.* ¶¶ 10-11.)  Payment under Contract 83114 in the amount of $420,375.00 was due on August 31, 2014.  (*Id.* ¶ 10.)  Payment under Contract 185052 for $232,500.00 was also due on August 31, 2014. (*Id.* ¶ 11.) (Contract 185052 and Contract 83114 will be referred to collectively in this Memorandum and Order as the "Contracts".) JDH alleges that Trans Coastal failed to make timely payment to JDH under the Contracts.  (*Id.*)  JDH alleges both Contracts are in breach and seeks $653,025.65 in damages. (*Id.* ¶ 19.)

**B.      Interaction Between the Parties and the State of Nebraska**

Trans Coastal is not registered to do business in Nebraska, and does not have a registered agent in Nebraska. (Moses Aff., Filing No. 16-1 ¶¶ 14-15.) Trans Coastal has never owned or leased real or personal property in Nebraska and has never maintained an office there. (*Id.* ¶¶ 16-18.) All of Trans Coastal's employees reside and work in Illinois, Kansas, Missouri, or Minnesota, and Trans Coastal has never maintained an office in Nebraska. (*Id.* ¶¶ 17-18.) None of Trans Coastal's shareholders resides in Nebraska, nor has it ever derived income from Nebraska. (*Id.* ¶¶ 19-20.) Trans Coastal

2

has never advertised for business in Nebraska and maintains that it has never initiated any communications with anyone in Nebraska, including JDH.[1] (*Id.* ¶¶ 22-26.)

The Contracts in this case were brokered in locations outside Nebraska, including Houston, Texas; Bangor, Maine; Kansas City, Missouri; and McMinnville, Oregon. (Moses Aff., Filing No. 16-1 ¶¶ 31-32.) All DDGS purchased by Trans Coastal from JDH was delivered to Channahon, Illinois; Elwood, Illinois; or Kansas City, Kansas. (*Id.* ¶ 34; *see also* Filing No. 16-3.) To purchase the DDGS, Trans Coastal applied for and received credit from JDH.  The credit application and approval were conducted in Nebraska and Trans Coastal used its credit to purchase large quantities of DDGS from JDH.  (Filing No. 18 at 3.)  However, the applications for credit state that the terms and conditions of the parties' credit agreements were to be carried out in Tulare, California. (Trans Coastal Credit App., Filing No. 25-3 at ECF 1, 2, 3.) The parties do not dispute that Trans Coastal has purchased up to 3.9 million dollars' worth of DDGS from JDH over the past two years.  (Filing No. 25-2 ¶ 8.)

## STANDARD OF REVIEW

To survive a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), "the plaintiff must state sufficient facts in the complaint to support a reasonable inference that defendants may be subjected to jurisdiction in the forum state."  *Steinbuch v. Cutler*, 518 F.3d 580, 585 (8th Cir. 2008).  When jurisdiction has been challenged, "the plaintiff has the burden of proving facts supporting personal jurisdiction,"  *Miller v. Nippon Carbon Co., Ltd.*, 528 F.3d 1087, 1090 (8th Cir.

---

[1] In Trans Coastal's brief in reply, its position shifts slightly, stating that "most communications between the parties were initiated by Plaintiff's representatives." (Filing No. 26 at 5.) This variance is noted, but the Court concludes the parties' communications were insufficient to confer jurisdiction.

2008), but a plaintiff need only "establish[ ] a prima facie case" that personal jurisdiction exists.  *Steinbuch*, 518 F.3d at 585.  The plaintiff's showing is "tested, not by the pleading alone, but by the affidavits and exhibits presented" in support of and in opposition to the motion to dismiss for lack of personal jurisdiction.  *Coen v. Coen*, 509 F.3d 900, 904-05 (8th Cir. 2007) (internal quotations omitted).  When considering these evidentiary materials, the Court must view the facts in the light most favorable to the plaintiff and resolve all factual conflicts in the plaintiff's favor.  *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991).

In determining whether this Court has personal jurisdiction over a nonresident defendant, two issues are presented: (1) whether the requirements of the Nebraska long-arm statute are satisfied and (2) whether the exercise of jurisdiction over this Defendant will violate the Fourteenth Amendment Due Process Clause.  *Coen*, 509 F.3d at 905.  Because Nebraska's long-arm statute, Neb. Rev. Stat. § 25-536,[2] has been interpreted to extend jurisdiction over nonresident defendants to the fullest degree allowed by the Due Process Clause of the United States Constitution, *Wagner v.*

---

[2] Neb. Rev. Stat. § 25-536 provides:

A court may exercise personal jurisdiction over a person:
(1) Who acts directly or by an agent, as to a cause of action arising from the person:
(a) Transacting any business in this state;
(b) Contracting to supply services or things in this state;
(c) Causing tortious injury by an act or omission in this state;
(d) Causing tortious injury in this state by an act or omission outside this state if the person regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state;
(e) Having an interest in, using, or possessing real property in this state; or
(f) Contracting to insure any person, property, or risk located within this state at the time of contracting; or
(2) Who has any other contact with or maintains any other relation to this state to afford a basis for the exercise of personal jurisdiction consistent with the Constitution of the United States.

*Unicord Corp.*, 526 N.W.2d 74, 77-78 (Neb. 1995), the Court need only determine whether the assertion of jurisdiction offends constitutional limits.

In order to exercise personal jurisdiction over a nonresident defendant, due process requires that the defendant have "minimum contacts" with the forum state such that maintenance of a suit against that defendant does not offend "'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  A defendant's minimum contacts with the forum state "must exist either at the time the cause of action arose, the time the suit is filed, or within a reasonable period of time immediately prior to the filing of the lawsuit." *Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003).

"The Supreme Court has recognized two theories for evaluating personal jurisdiction: general and specific jurisdiction."  *Steinbuch*, 518 F.3d at 586 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–15 (1984)). "Under the theory of general jurisdiction, a court may hear a lawsuit against a defendant who has 'continuous and systematic' contacts with the forum state, even if the injuries at issue in the lawsuit did not arise out of the defendant's activities directed at the forum." *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1073 (8th Cir. 2004) (quoting *Helicopteros*, 466 U.S. at 415–16); *see also Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 819 (8th Cir. 1994) (alteration in original) (quoting *Sondergard v. Miles, Inc.*, 985 F.2d 1389, 1392 (8th Cir. 1993)) ("'[g]eneral jurisdiction . . . refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose.'")  On the other hand, under the theory of specific jurisdiction, "the injury giving rise to the lawsuit [must have] occurred within or had some

connection to the forum state." *Dever*, 380 F.3d at 1073 (citing *Helicopteros*, 466 U.S. at 414; *Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 819 (8th Cir. 1994)). In other words, a court will have specific jurisdiction over a cause of action "arising from or related to a defendant's actions within the forum state." *Bell Paper Box*, 22 F.3d at 819 (quoting *Sondergard*, 985 F.2d at 1392) (internal marks omitted).

Under either theory, the defendant must have committed "some act by which the defendant purposely avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Dever*, 380 F.3d at 1073 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (internal marks omitted)); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citing *Hanson*, 357 U.S. at 253). The defendant's "purposeful availment must be sufficient to provide the defendant with fair warning that his activities might result in his being haled into court in that jurisdiction." *Johnson v. Woodcock*, 444 F.3d 953, 955 (8th Cir. 2006) (citing *Porter v. Berall*, 293 F.3d 1073, 1075 (8th Cir. 2002)). In other words, the defendant's contacts with the forum state must not be "random," "fortuitous," "attenuated," or the result of the "unilateral activity of another party or a third person." *Burger King*, 471 U.S. at 475 (quotations and citations omitted). Once it has been determined that the nonresident defendant purposefully established minimum contacts with the forum state, such contacts must be analyzed in light of other factors to determine whether the exercise of personal jurisdiction over the nonresident defendant comports with "fair play and substantial justice." *Id.* at 476 (quotations and citation omitted).

Keeping the foregoing principles in mind, the Eighth Circuit instructs courts to consider the following factors to determine whether jurisdiction comports with due

process: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of those contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties." *Coen*, 509 F.3d at 905 (quotations and citation omitted).[2]  The third factor–the relation of the cause of action to the contacts–refers to the distinction between specific and general jurisdiction.  *Id.*  In applying these factors, the central inquiry is the "relationship among the defendant, the forum, and the litigation." *Land-O-Nod Co. v. Bassett Furniture Indus., Inc.*, 708 F.2d 1338, 1340 (8th Cir. 1983) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977) (internal marks omitted)).  Therefore, the fourth and fifth factors are of secondary importance and not determinative.  *Id.*; *see also Coen*, 509 F.3d at 905.

## DISCUSSION

### A.    Specific Jurisdiction

#### 1.    Quality, Quantity, and Nature of Trans Coastal's Contacts

Considering the necessary factors, the Court concludes that it lacks specific personal jurisdiction over Trans Coastal. JDH identifies five facts that establish Trans Coastal's minimum contacts with Nebraska: (a) Trans Coastal's knowledge and admission that JDH is a Nebraska company, (b) the fact that the Contracts anticipated

---

[2] S*ee also Sybaritic, Inc. v. Interport Int'l, Inc.*, 957 F.2d 522, 524 (8th Cir. 1992) (citing *Falkirk Mining Co. v. Japan Steel Works, Ltd.*, 906 F.2d 369, 373-74 (8th Cir. 1990)):

> [W]e explained that the determination of whether personal jurisdiction comports with due process may be guided by a careful consideration of the following five factors: (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. . . . This analytical framework incorporates the notions of both "minimum contacts" and "fair play and substantial justice."

future dealings in Nebraska, (c) "wash transactions" between JDH and Trans Coastal, (d) Trans Coastal's solicitation of credit from JDH, and (e) emails and phone calls between JDH and Trans Coastal relating to the parties' business relationship. Viewing the evidence in a light most favorable to JDH, the Court concludes these contacts do not support specific personal jurisdiction.

### (a) Knowledge That JDH was a Nebraska Company

JDH argues that Trans Coastal purposefully availed itself of doing business in Nebraska because Trans Coastal knew JDH was a Nebraska company. JDH relies on the Eighth Circuit's reasoning in *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515 (8th Cir. 2010), wherein the court noted that the defendant "solicited the plaintiff's business, knowing that Wells Dairy was an Iowa corporation." *Id.* at 520.

The Supreme Court recently addressed this argument in *Walden v. Fiore*, 134 S. Ct 1115 (2014). In *Walden*, the Supreme Court concluded that a defendant's knowledge of a plaintiff's "strong forum connections" are not sufficient to satisfy the minimum contacts inquiry. *Id.* at 1124. The Supreme Court explained that arguments such as these "impermissibly allow[] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.* at 1125. In analyzing the minimum contacts question, "the plaintiff cannot be the only link between the defendant and the forum." *Id.* at 1122. Following this precedent, Trans Coastal's knowledge that JDH is based in Nebraska cannot alone establish minimum contacts.[3]

---

[3] *See also Fastpath, Inc. v. Arbela Technologies Corp.*, 760 F.3d 816, 823 (8th Cir. 2014) (stating that that soliciting business from a company knowing that the company is in the forum state cannot create minimum contacts because the plaintiff cannot be the only link between the defendant and the forum) (citing *Walden v. Fiore*, 134 S.Ct at 1125 )(internal marks omitted); *Dairy Farmers of America, Inc. v.*

### (b)      Anticipated Future Dealings in Nebraska

JDH argues that personal jurisdiction over Trans Coastal is appropriate because the Contracts contemplated future consequences in Nebraska. The Eighth Circuit has stated that "[a] contract between a plaintiff and an out-of-state defendant is not sufficient in and of itself to establish personal jurisdiction over the defendant in the plaintiff's forum state." *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 593 (8th Cir. 2011). "Personal jurisdiction, moreover, does not turn on 'mechanical tests or on conceptualistic theories of the place of contracting or of performance.'" *Id.* (quoting *Burger King*, 471 U.S. at 478–79). "Instead courts should consider the terms of the contract and its contemplated future consequences in determining whether personal jurisdiction over a non-resident defendant exists." *Fastpath*, 760 F.3d at 821.

With regard to the contractual terms and contemplated consequences, Trans Coastal argues that the facts in this case are analogous to *Fastpath*. In *Fastpath*, the Eighth Circuit refused to find personal jurisdiction in a case involving an Iowa plaintiff, a California defendant, and an alleged breach of a covenant not to compete. *Fastpath*, 760 F.3d 816. In holding that the defendant was not subject to personal jurisdiction in Iowa, the Eighth Circuit reasoned that the defendant did not have employees or offices in Iowa, never traveled to Iowa, and allegedly breached the parties' agreement outside Iowa. *Id.* at 822. The court noted that the agreement was not for the sale of any goods in Iowa, and although it contemplated the exchange of ideas between the parties, it was "silent as to where the contemplated sharing of information was to take place." *Id.* To

---

*Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 478-79 (8th Cir. 2012) (concluding that the defendant's contacts with Missouri did not support jurisdiction, even where the defendant knew the plaintiff's headquarters was in Missouri).

the extent any information was actually shared between the parties, that sharing took place outside Iowa. *Id*.

The Eighth Circuit also rejected the plaintiff's argument that personal jurisdiction was appropriate because the defendant "aggressively pursued" a business relationship with an Iowa company, sent emails and made telephone calls to Iowa, obtained access to information about software developed in Iowa, and executed an agreement that imposed obligations on the plaintiff in Iowa. *Id*. Noting its obligation to consider the "defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there," the court stated that any "pursuit" of the plaintiff occurred outside Iowa. *Id*. at 823 (internal citation omitted). Further, as noted above, the Eighth Circuit rejected the argument that the defendant's knowledge that it was doing business with an Iowa company subjected the defendant to jurisdiction. *Id*. The Court explained that this approach "impermissibly allows a plaintiff's contacts with the defendant and the forum to drive the jurisdictional analysis." *Id*. (citing *Walden*, 134 S.Ct. at 1125).

JDH makes many of the same arguments put forth by the plaintiff in *Fastpath*. JDH argues that personal jurisdiction is appropriate based upon prior negotiations, future contemplated consequences as shown by the express terms of the contract and the parties' course of dealing. However, as in *Fastpath*, JDH and Trans Coastal's negotiations took place outside the disputed forum. The Contracts at issue were also executed outside Nebraska. Though it is unclear to the Court whether the parties specifically agreed the DDGS would come from Nebraska, the parties do not dispute that the DDGS contemplated in the Contracts was to be delivered outside Nebraska. Even if the parties agreed that the DDGS would come from Nebraska, this fact would

10

not establish jurisdiction. In *Fastpath*, the Eighth Circuit concluded that jurisdiction was not appropriate even where any future development of software products might have occurred in Iowa. *Fastpath*, 760 F.3d at 822. The Eighth Circuit specifically noted that any sharing of information took place outside Iowa, and there was no indication that Iowa was central to the parties agreement. *Id*. Similarly, in this case there is no indication from the face of the Contracts that Nebraska was in any way central to the parties' agreement. For example, the credit applications stated that all terms and conditions of the credit would take place in California. The alleged failure to pay on the Contracts resulted from delivery outside Nebraska. There is no indication that any of Trans Coastal's actual and contemplated dealings with Nebraska under the Contracts were more than incidental. *See Fastpath*, 760 F3d at 824. Accordingly, this argument does not support jurisdiction over Trans Coastal.

### (c)    *Wash Transactions*

JDH cannot establish personal jurisdiction based on the "wash transactions" between the parties because such transactions are an accounting convention that did not result in meaningful contact with Nebraska. The parties' descriptions of what constitutes a wash transaction differ slightly. JDH states that a wash transaction is a term of trade usage "to describe an option elected by a buyer when it cannot maintain an agreed shipping schedule and seeks to 'sell-out' to the seller and thus have the product repurchased and resold later by the seller 'for the buyer's account.'" (Pl. Br., Filing No. 20 at 4.)  According to JDH, the effect of exercising this option transformed

11

Trans Coastal into a seller of DDGS to JDH.[4]   Therefore, according to JDH, Trans

Coastal's "sell-out" of DDGS back to JDH established contacts within Nebraska

because Trans Coastal effectively sold DDGS to a Nebraska company. JDH further

alleges that as a result of the wash transactions, JDH was required to perform specific,

special accounting activities for Trans Coastal in Nebraska.  (*Id.* at 10.)

Trans Coastal argues that "[a] 'wash transaction' does not alter [JDH]'s status of

seller and [Trans Coastal's] status as buyer."  (Def. Reply Br., Filing No. 26 at 2.)  To

the extent that the contracts designate Trans Coastal as the "seller" of DDGS, Trans

Coastal argues that this "label was merely used to indicate that a wash had occurred."

(*Id.* at 2.)  Trans Coastal claims that wash transactions have no effect on their status as

a buyer, and, even if they did, no "washes" occurred in Nebraska nor did any

transactions result in "delivery or shipment of DDGS to [JDH] in Nebraska." (*Id.*)

Instead, these washes occurred at the point of delivery in Kansas City or Illinois and did

not involve the physical shipment of DDGS from Trans Coastal to JDH's Nebraska

facilities. (*Id.*; Moses Aff., Filing No. 16-3 ¶¶ 12-13).

Trans Coastal cites *Dairy Farmers*, in support of its position.  In *Dairy Farmers*,

the Eighth Circuit held that the administration of commodity trading in the forum state

did not establish contacts because the contract "did not contemplate that [plaintiff] would

perform coordination and processing in [the forum state]."  *Dairy Farmers*, 702 F.3d at

478. Trans Coastal argues that because any delivery took place outside Nebraska, the

processing and accounting that JDH performed in Nebraska was merely incidental.

---

[4] JDH includes in its brief a summary of the wash transactions designating JDH as the buyer with Trans Coastal as the seller, arguing that Trans Coastal "sold" 39,500 tons of DDGS to JDH. (Filing No. 20 at 3; *see also* Filing No. 16-3.)

JDH cites *Wells Dairy*, in support of its position. In *Wells Dairy*, plaintiff and defendant engaged in a series of transactions which "involved the submission of a purchase order, the accessing of credit, and 'customer pick up' in Iowa." *Wells Dairy*, 607 F.3d at 519. The defendant also "remitted payment to Wells Dairy *in Iowa* for its purchases." *Id.* (emphasis in original). The Court further concluded that the breach of contract itself occurred in Iowa. *Id.* The Eighth Circuit held there was personal jurisdiction noting the defendant had:

> purposefully availed itself of the privilege of conducting activities within Iowa when it solicited an Iowa company for business, sought to purchase the Iowa company's products on credit provided by the Iowa company, negotiated and fulfilled the "customer pick up" delivery term, and entered into more than 100 transactions over the course of two years, during which it relied on the Iowa company for customer support.

*Id.* at 520.

JDH argues that the "customer pick up" term in the contracts at issue in *Wells Dairy* is similar to the wash transactions that occurred in this case because it allowed the defendant's customers to "take possession of the products in Iowa, effectively accepting delivery and redelivering the product to its customers." *Wells Dairy*, 607 F.3d at 519. Specifically, JDH explains "Trans Coastal 'effectively' accepted delivery and redelivered the Nebraska DDGS product to JDH in the wash transactions." (Filing No. 20 at 17.) However, the "customer pick up" term in *Wells Dairy* is inapposite to the wash transactions in this case because the wash transactions do not have the same legal effect. As stated above, the "customer pick up" term allowed the defendant's customers to take possession of the products in Iowa, effectively allowing the defendant to accept delivery and redeliver the product to its customers in the forum state. *Id.* at 519. The

Eighth Circuit noted that the effect of this term was to cause the defendant's customers to enter Iowa and receive the product in the forum state. *Id.* at 520.

In this case, the wash transactions did not occur in Nebraska, nor did they result in JDH taking possession of DDGS in Nebraska. Rather, the wash transactions took place in Channahon, Illinois; Elwood, Illinois; and Kansas City, Kansas. There is no evidence that there was any physical shipment of DDGS to JDH in Nebraska, nor is there evidence that the wash transactions would cause JDH's customers to enter Nebraska. (Filing No. 27-1 ¶¶ 12-13.) Accordingly, the "customer pick up" term in *Wells Dairy* is distinguishable from the structure of the wash transactions in this case, and the wash transactions do not establish jurisdiction over Trans Coastal.

JDH also argues that Trans Coastal's request for the wash transactions caused JDH employees to take administrative steps to carry out accounting tasks in Nebraska. As stated above, the Eighth Circuit in *Dairy Farmers* held that the plaintiff's administration of a commodities contract in forum state is a "random, fortuitous, and attenuated" contact insufficient to confer personal jurisdiction over out-of-state defendant. *Dairy Farmers*, 702 F.3d at 478-79. Based upon this precedent, the Court concludes that JDH's administration of the wash transactions in Nebraska was insufficient to establish personal jurisdiction over Trans Coastal.

### (d)     Solicitation of Credit

JDH contends that Trans Coastal's solicitation of credit from a Nebraska company establishes minimum contacts with Nebraska. JDH again cites *Wells Dairy*, in which the Eighth Circuit noted that the defendant "sought credit approval from Wells Dairy, submitting its application to [Wells Dairy] . . . . The application was processed and

14

approved in Iowa, allowing the company to charge approximately $6.5 million to its Wells Dairy account." *Wells Dairy*, 607 F.3d at 519. The court considered the application for credit to be relevant, reasoning that the defendant "sought and applied for credit from the Iowa company, which was a precursor to their ongoing business relationship." *Id.* at 520. This factor, among others, persuaded the Eighth Circuit that there was personal jurisdiction over the defendant in Iowa. *Id.* JDH argues this case is analogous to *Wells Dairy* because Trans Coastal submitted a credit application to JDH which was processed and approved in Nebraska. (*See* Isham Aff., Filing No. 25-2 ¶ 3.) Trans Coastal subsequently purchased DDGS on credit from JDH. (*Id.*)

The Court concludes, however, that the reasoning in *Wells Dairy* is distinguishable and the credit applications in this case do not establish Trans Coastal's contacts with Nebraska. The Eighth Circuit's decision in *Dairy Farmers* is instructive. In *Dairy Farmers*, the plaintiff asserting personal jurisdiction cited *Wells Dairy*, arguing that the defendant sought and received credit in Missouri, the forum state, knowing that the plaintiff had a Missouri headquarters. 702 F.3d at 748. The court found the credit application did not support the exercise of personal jurisdiction. *Id.* at 479. The court distinguished *Wells Dairy*, reasoning that the parties in that case had "contracted to purchase on credit product manufactured in Iowa for delivery in Iowa and to remit payment to Iowa." *Id.* In contrast, the parties in *Dairy Farmers* did not contract to purchase on credit a product for delivery in the forum state, nor had the parties agreed to remit to the forum state. *Id.*

Unlike the parties in *Wells Dairy*, the parties here did not contract for delivery in Nebraska. The DDGS was to be delivered to Trans Coastal's loading centers in Kansas

15

City or Illinois. Although JDH states that the credit application was received and processed in Nebraska, the applications themselves stated that "[t]his application and agreement is made at Tulare, California, and all terms and conditions of the agreement are to be performed at Tulare, California. It is agreed that venue for any litigation shall be in Tulare County, California."  (Trans Coastal Credit App., Filing No. 25-3 at ECF 1, 2, 3.) JDH characterizes this as out-of-date form language, and argues that Trans Coastal knew its application would be processed in Nebraska because it knew JDH was based in Nebraska. However, in addition to the plain language of the applications, JDH admits that it has employees—including its chairman—in California, and there is no evidence that Trans Coastal knew processing would occur in Nebraska. This fact weighs against purposeful availment of the laws of Nebraska. *See Dairy Farmers*, 702 F.3d at 478 (noting that the contract did not contemplate coordination or processing in the forum state). Based upon the Eighth Circuit's reasoning in *Dairy Farmers*, the Court concludes that Trans Coastal's solicitation of credit is not enough to establish minimum contacts with Nebraska. Accordingly, this fact does not weigh in favor of the exercise of jurisdiction.

### (e)    Emails and Phone Calls to Nebraska

JDH contends that the correspondence between JDH and Trans Coastal employees established contacts with Nebraska. JDH claims at least 100 email exchanges between JDH and Trans Coastal employees and more than fifteen telephone calls. For communications to support a finding of personal jurisdiction, they must establish a "deliberate and substantial connection with the state such that [Trans Coastal] could reasonably anticipate being haled into court there."  *Viasystems, Inc v.*

16

*EBM-Papst St. Georgen GmbH & Co.*, 646 F.3d 589, 594 (8th Cir. 2011).   Incidental communication will not be sufficient. *Id.* In *Viasystems*, the court held that "scattered emails, phone calls, and a wire-transfer of money to [Plaintiff] in [the forum state]" did not create a deliberate and substantial connection. *Id.*; *see also Fastpath*, 760 F.3d at 823-24 (holing that numerous faxes, emails, and phone calls were not sufficient on their own to establish personal jurisdiction); *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100 (8th Cir. 1996) (holding that 100 phone calls were relevant, but were not by themselves sufficient for the court to exercise personal jurisdiction).

The correspondence in this case is insufficient to support personal jurisdiction on its own.  As this court has stated, "frequent communications, *when taken together with some other action directed toward the forum state*, may establish minimum contacts." *Venteicher v. Smyrna Air Center, Inc.*, 2009 WL 3254498, at *4 (D. Neb. Oct. 9, 2009) (emphasis added). As stated above, none of the other reasons given to advance JDH's position supports a finding of jurisdiction over Trans Coastal. Accordingly, the phone calls and emails are insufficient by themselves for this Court to exercise personal jurisdiction.

## 2.    Nebraska's Interest and Convenience to the Parties

Because JDH has not established that Trans Coastal had minimum contacts with Nebraska, the forum's interest and the convenience of the parties do not support jurisdiction. Even though Nebraska "has an interest in providing its residents with a forum, that interest 'cannot make up for the absence of minimum contacts.'" *Fastpath*, 760 F.3d at 824 (quoting *Digi-Tel Holdings, Inc. v. Proteq Telecommunications (PTE), Ltd.*, 89 F.3d 519, 525 (8th Cir. 1996)). "The same is true of the last factor—party

convenience." *Id*. The fact that Nebraska may be a more convenient forum for JDH does not mean that Nebraska courts have personal jurisdiction over Trans Coastal. Accordingly, the Court lacks specific personal jurisdiction over Trans Coastal.

**B.      General Jurisdiction**

JDH does not dispute that the Court lacks general personal jurisdiction over Trans Coastal. The Supreme Court has recently held that general jurisdiction over an out-of-state corporation may be appropriate when its affiliations with the forum state are continuous and systematic so as to render the corporation at home in that state. *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014). There is no evidence that Trans Coastal's connections with Nebraska meet the requirements of general jurisdiction. Accordingly, there is no general jurisdiction over Trans Coastal.

**CONCLUSION**

The parties' dealings and Contracts do not establish specific personal jurisdiction over Trans Coastal. The Contracts were negotiated and allegedly breached outside Nebraska. Trans Coastal's contacts with Nebraska were merely incidental to the parties' dealings, and Trans Coastal did not have a continuous and systematic presence in Nebraska.

Accordingly,

IT IS ORDERED:

1.      The Motion to Dismiss (Filing No. 14) filed by Defendant Trans Coastal Supply Co., Inc. is granted;

2.      Plaintiff's Complaint (Filing No. 1) is dismissed; and

3.      A separate judgment will be entered.

18

Dated this 20th day of February, 2015

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge