IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| J.D. HEISKEL HOLDINGS, LLC,<br><br>　　　　　　Plaintiff,<br><br>　vs.<br><br>TRANS COASTAL SUPPLY CO., INC.,<br><br>　　　　　　Defendant. | 8:14CV277<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the Motion to Alter or Amend Judgment (Filing No. 33) filed by Plaintiff J.D. Heiskel Holdings, LLC ("JDH"). For the reasons stated below, the Motion will be denied.

## BACKGROUND

On February 20, 2015, this Court entered a Memorandum and Order (Filing No. 31) granting the Motion to Dismiss filed by Defendant Trans Coastal Supply Co., Inc. ("Trans Coastal") on the grounds that the Court lacked personal jurisdiction over Trans Coastal. JDH now asks the Court to amend its Memorandum and Order, arguing the Court failed to consider the evidence in a light most favorable to JDH regarding so-called "wash transactions" and Trans Coastal's credit applications. JDH argues that proper consideration of this evidence would demonstrate that JDH established a prima facie case of personal jurisdiction over Trans Coastal, and JDH should not be forced to file an action elsewhere for an injury Trans Coastal caused in Nebraska.

## STANDARD

The Court has broad discretion in determining whether to grant or deny a motion to alter or amend judgment pursuant to Federal Rule of Civil Procedure 59(e). *United*

*States v. Metropolitan St. Louis Sewer Dist.*, 440 F.3d 930, 933 (8th Cir. 2006). Rule 59(e) motions serve a limited function of correcting "manifest errors of law or fact or to present newly discovered evidence." *Id.* (quoting *Innovative Home Health Care v. P.T.-O.T. Assoc. of the Black Hills*, 141 F.3d 1284, 1286 (8th Cir. 1998)). "Such motions cannot be used to introduce new evidence, tender new legal theories, or raise arguments which could have been offered or raised prior to entry of judgment." *Id.* JDH does not present newly discovered evidence. Accordingly, the Court need only determine whether its previous analysis was manifestly erroneous with respect to consideration of the evidence of wash transactions and credit applications.

## DISCUSSION

### I.   Wash Transactions

JDH claims the Court erred by failing to give proper weight to the effect of certain wash transactions, adopting instead Trans Coastal's position that the transactions were merely an accounting convention insufficient to support personal jurisdiction. In determining which of these positions is correct, the Court was required to "look at the facts in the light most favorable to the nonmoving party, and resolve all factual conflicts in favor of that party." *Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741, 745 (8th Cir. 2011) (citations and quotations omitted). Although the Court must accept the plaintiff's version of the facts as true, the court need not accept "the plaintiff's *characterization* of the facts." *Fisher Bros. Sales, Inc. v. United States,* 46 F.3d 279, 286 (3d Cir.1995) (emphasis in original); *see also Gen. Dynamics Corp. v. United States,* 139 F.3d 1280, 1283 (9th Cir.1998) (citing *Fisher Bros.* with approval). JDH argues that the Court failed to give proper consideration to the fact that the wash transactions involved "actual

2

sales" of dried distiller's grain with soluables ("DDGS") from Trans Coastal to JDH; that the grain was located in Nebraska facilities, not in Illinois or Kansas; that Trans Coastal and JDH principals directly negotiated the wash transactions; and that the wash transactions were central to JDH's claim and the cause of its injury in Nebraska. Although the Court has given the evidence a "fresh look" with respect to the wash transactions, the Court concludes that they do not support personal jurisdiction over Trans Coastal.

      ***a.    Relationship to Injuries Giving Rise to the Lawsuit***

The relationship of the wash transactions to JDH's alleged injuries is relevant to the Court's jurisdictional analysis because "specific jurisdiction is viable only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state." *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1073 (8th Cir. 2004) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984)).  JDH argues that the Court mistakenly undervalued the importance of the wash transactions and argues that its losses in the wash transactions were an "integral and a massive part" of the damages JDH suffered. (Filing No. 36 at 4.)  This statement is unsupported by JDH's allegations or its evidence. While it appears JDH used the wash transactions to calculate damages,[1] JDH has alleged no loss as a direct result of the wash transactions.  The injuries at issue in this lawsuit arise from Trans Coastal's breach of

---

[1] JDH's CFO, Timothy J. Regan, explained that the wash transactions were integral for determining how much DDGS was delivered to Trans Coastal to determine how much money Trans Coastal owed JDH.  (Regan Aff, Filing No. 25-1 ¶ 11.)  Regan explained that after accounting for the wash transactions, "JDH determined Trans Coastal still owed JDH tens of thousands of tons of other DDGS previously delivered by JDH to Trans Coastal for which JDH had not been paid."  (Regan Aff, Filing No. 25-1 ¶ 11.)  Thus, the wash transactions did not give rise to the injuries alleged in the Complaint, but were relevant to calculating the damages owed to JDH as a result of the alleged injuries giving rise to the lawsuit.

3

the Contracts[2] identified in the Complaint, failure to pay on its account with JDH, and unjust enrichment (Compl., Filing No. 1 ¶¶ 15-28.), not from Trans Coastal's request for wash transactions. Thus, the wash transactions are only tangentially related to the injuries actually alleged in the Complaint. .

### b.  *Nature of the Wash Transactions*

JDH argues that the Court failed to recognize the wash transactions as "actual sales" of DDGS from Trans Coastal to JDH. JDH relies on Trans Coastal's designation as "seller" in the invoices reflecting the wash transactions. (Filing No. 20 at 3; *see also* Filing No. 16-3.) JDH also asserts that the definitions within the industry rules for the National Grain and Feed Association ("NGFA"), incorporated into the Contracts, established that sell-out transactions involved the "actual sale of grain." (NFGA Grain Trade Rules, Filing No. 30-2 at 13.) JDH argues that because the wash transactions are "sell-outs" under the NGFA Rules, and "sell-outs" are, by definition, actual sales of grain, the wash transactions are by extension not an accounting convention, as urged by Trans Coastal.[3]

Labeling Trans Coastal as the "seller" in the wash transactions does not, on its own, establish personal jurisdiction, nor does labeling the wash transactions as "actual

---

[2] The term Contracts in this Memorandum and Order refers to the contracts identified in the Complaint and previous Memorandum and Order as Contract 83114 and Contract 185052, and collectively referred to as the "Contracts".

[3] The NFGA Grain Trade Rules do not define "wash transactions" in the grain trade industry. Rather, the Rules define the term "sell-out" to mean "an actual sale of grain of like kind and quantity on the open market, provided that when this is not feasible or would result in undue penalty to the Buyer, the Seller shall have the privileges of establishing a fair market value for the purpose of determining any loss properly chargeable to the Buyer." (NFGA Grain Trade Rules, Filing No. 30-2 at 13.) Other than affidavit testimony, there is no evidence that "wash transactions" are sell-outs as defined above. Thus, the Court assumes without deciding that a "wash transaction" is a form of "sell-out" as described in the NFGA Rules.

sales of grain." *See Aaron Ferer & Sons Co. v. Diversified Metals Corp.*, 564 F.2d 1211, 1215 (8th Cir. 1977) ("[W]e think the ultimate test is whether the defendant, either as seller or buyer, has performed some act by which (it has) purposefully (availed) itself of the privilege of conducting activities within the forum state thus invoking the benefits and protections of its laws.") (internal marks and citations omitted). The Court was therefore required to examine the nature of the transactions to determine whether they support minimum contacts with Nebraska. *See Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 520 (8th Cir. 2010).

According to JDH, when it repurchased DDGS from Trans Coastal that was physically located in Nebraska to carry out the wash transactions, Trans Coastal purposefully directed its activities toward Nebraska. JDH argues that Trans Coastal was similar to the defendant in *Wells Dairy* who solicited the plaintiff's business knowing the plaintiff was a resident of the forum state, received product from the plaintiff in the forum state, and simultaneously transferred possession of the product to customers in the forum state. *See Wells Dairy*, 607 F.3d at 520. The Eighth Circuit explained in another case that these facts were critical based on the parties' agreement because "in *Wells Dairy* the defendant's relationship with plaintiff contemplated consequences specifically in Iowa—the parties contracted for the Iowa corporation to deliver product in Iowa to defendant's Iowa customers. Iowa was central to the parties' bargain." *Fastpath, Inc. v. Arbela Technologies Corp.*, 760 F.3d 816, 824 (8th Cir. 2014) (citation omitted).

Here, there is no evidence that Nebraska was central to the parties' agreement with respect to the wash transactions. JDH argues that by requesting the wash transactions, Trans Coastal effectively solicited the business of a Nebraska company

and allowed Trans Coastal to accept delivery and simultaneously redeliver DDGS in Nebraska. There is no evidence, however, that the wash transactions resulted in Trans Coastal taking possession of DDGS in Nebraska and transferring it to its customers in Nebraska. *Compare Wells Dairy*, 607 F.3d at 520 (concluding that the defendant's relationship with the plaintiff contemplated specific consequences in the forum state such as effective delivery to the defendant's customers in the forum state). Neither does the evidence show that Trans Coastal caused DDGS to be physically delivered to JDH.[4] Nor can it be inferred that Trans Coastal, as a seller, "solicit[ed] the right to ship goods into the forum state." *See Aaron Ferer*, 564 F.2d at 1214 (citation and marks omitted).

Other than administrative and accounting functions performed by JDH in Nebraska, there is no evidence suggesting that the physical location of the DDGS was central to the wash transactions. Timothy Regan, JDH's CFO, and Jay Weber, a JDH Commodity Trader, both refer to Trans Coastal's request for wash transactions as demanding "special accounting treatment." (Regan Aff, Filing No. 25-1 ¶ 9; Weber Aff., Filing No. 25-6 ¶ 11.) The evidence does not describe any actions taken by JDH with respect to the DDGS other than accounting treatment, nor is there evidence that Trans Coastal knew its request would result in the type of activities that would subject it to jurisdiction in Nebraska. As discussed at length in the Court's prior Memorandum and Order, the administrative tasks resulting from the request for wash transactions in

---

[4] In the Court's previous Memorandum and Order, the Court stated that there was no evidence that the wash transactions resulted in "JDH taking possession of DDGS in Nebraska." (Filing No. 31 at 14.) For clarification, the Court referred to the act of "taking possession" of DDGS to mean that JDH took possession of DDGS that it did not previously possess, i.e., that Trans Coastal delivered DDGS to JDH.

Nebraska was insufficient to confer personal jurisdiction. (Filing No. 31 at 14); *see also Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 478-79 (8th Cir. 2012) (holding that the plaintiff's administration of a commodities contract in forum state is a "random, fortuitous, and attenuated" contact insufficient to confer personal jurisdiction over out-of-state defendant).

JDH argues that the Court's conclusion was erroneous because the Court ignored JDH's evidence that its "Elkhorn, Nebraska office fully coordinates and processes all DDGS orders including those relating to Trans Coastal and is not merely an office where contract administration occurs." (Regan Aff., Filing No. 25-1 ¶ 4.) Despite this assertion, JDH's own evidence describes the tasks it performed with respect to the wash transactions as administrative. For example, Timothy Regan stated that in response to the requests, he took "administrative steps" to resell the DDGS as a result of the wash transactions. (Regan Supp. Aff., Filing No. 30-1 ¶ 3.) Both Regan and Weber explained that Trans Coastal's request for wash transactions caused JDH employees to take administrative and bookkeeping steps related to the repurchase and resale of the DDGS. (Filing No. 25-1 ¶ 9; Filing No. 25-6 ¶ 11.) Based on this description of JDH's tasks, the Court concluded that JDH's activity in relation to the wash transactions was administrative and insufficient to confer jurisdiction.

JDH attempts to avoid this result by drawing a distinction between "coordination and processing" of contracts and "contract administration," arguing that the former supports jurisdiction even if the latter does not. JDH states that the Eighth Circuit pronounced this distinction in *Dairy Farmers* and explained it further in *Fastpath*. In *Dairy Farmers* the court found personal jurisdiction lacking over a defendant in Missouri

where no prior negotiations took place in Missouri and the contract did not specifically contemplate "coordination and processing" of orders in Missouri. 702 F.3d at 478. The court reasoned that because the contract was for a Colorado product delivered to Mexico and paid for in Illinois, the plaintiff's administration of the contract in Missouri by virtue of its location there was insufficient to confer personal jurisdiction in Missouri. *Id*. at 478-79. JDH argues that the Contracts in this case are distinguishable because they contemplated coordination and processing of orders in Nebraska.

Although the distinction between "administration of a contract" and "coordination and processing of orders" is not readily apparent, *Dairy Farmers* and other Eighth Circuit cases suggest that the distinction for purposes of personal jurisdiction analysis relates to the nature of the defendant's relationship with the forum state, and not the defendant's relationship with the plaintiff. In *Dairy Farmers*, the defendant knew that the plaintiff determined product price, processed purchase orders, generated invoices, processed payments, coordinated inventory, and administered the preparation of shipping documents in Missouri. *Dairy Farmers*, 702 F.3d at 478. Despite knowledge that the plaintiff performed these activities in the forum state, the Eighth Circuit noted that the contracts did not specifically contemplate coordination and processing in Missouri, and the fact that the plaintiff administered the contract by performing these functions in Missouri was random, fortuitous, and attenuated. *Id*. at 478-79. In this case, JDH performed many of the same tasks with respect to the wash transactions, and, as discussed in its previous Memorandum and Order, the Contracts did not expressly contemplate any specific action to be taken in Nebraska. Accordingly, the Court concluded that JDH's activities were insufficient to confer personal jurisdiction.

8

JDH asserts that the Contracts were "coordinated and processed" in Nebraska because, in contrast to the product in *Dairy Farmers*, the DDGS in this case came from Nebraska, and Trans Coastal sent payment to JDH in Nebraska. These facts are also insufficient to establish personal jurisdiction. In *Scullin Steel Co. v. Nat'l Ry. Utilization Corp.,* 676 F.2d 309 (8th Cir. 1982), the Eighth Circuit held that due process precluded personal jurisdiction over a defendant even though the defendant made payment to the forum state for a product manufactured in the forum state and delivered to the forum state. *Id.* at 313-14. The court explained that the plaintiff could not rely "upon its performance under the contract within the forum to supply the requisite minimum contacts." *Id.* at 313.

Similarly, JDH relies wholly on its performance under the Contracts within Nebraska to establish jurisdiction. Although the DDGS was a Nebraska product, JDH received payment in Nebraska, and JDH administratively coordinated the wash transactions in Nebraska, these facts relate solely to JDH's relationship with the forum state, and are not determinative of whether Trans Coastal is subject to jurisdiction in Nebraska. *See Walden v. Fiore*, 134 S. Ct 1115 (2014) (holding that a plaintiff's contacts with the forum cannot drive the jurisdictional analysis). While there is no dispute that some of the DDGS sold and delivered to Trans Coastal was sent from Nebraska, the only geographic provisions in the contracts were for delivery in Illinois or Kansas. Further, even if it was foreseeable that the DDGS sold to Trans Coastal would come from Nebraska, and that the DDGS "sold" to JDH in the wash transactions never left Nebraska, such foreseeability was insufficient to establish personal jurisdiction. *See Mountaire Feeds, Inc. v. Agro Impex, S. A.*, 677 F.2d 651, 655-56 (8th Cir. 1982) ("It

9

may have been reasonably foreseeable that Mountaire would have manufactured the animal feed in Arkansas; Mountaire's principal place of business is located within Arkansas. However, foreseeability of an impact within the forum state alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause.") (citation and marks omitted). While JDH's evidence describes accounting and administrative activities performed as a result of Trans Coastal's request, there is no evidence that its request for wash transactions resulted in the types of activity that indicate purposeful availment of "conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Fastpath*, 760 F.3d at 821 (quoting *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2787 (2011)).

### c. *"Negotiation" of the Wash Transactions*

JDH argues that the Court gave improper weight to Trans Coastal's evidence with respect to the place the wash transactions were negotiated. In its principal brief in support of this Motion, JDH provided a table of statements adopted by the Court from Trans Coastal's evidence compared to statements from JDH evidence the Court allegedly overlooked. JDH specifically identifies the Court's statements regarding the places where the Contracts at issue were negotiated and executed, as well as the contemplated point of delivery. (Filing No. 34 at 6-8.) The cited statements refer to negotiation and delivery contemplated by the Contracts, while JDH's evidence purportedly contradicting the Court's conclusions refers solely to the wash transactions.[5]

---

[5] For example, JDH refers to statements including the term "Contracts." The term "Contracts" referred to Contract 185052 and Contract 83114, the contracts at issue in this case. (*See* Filing No. 31 at 2.) JDH's evidence contradicting these statements refers solely to the wash transactions. (*See* Filing No. 34 at 6-7.) JDH has not identified evidence suggesting that the Court's statements with respect to where

10

Neither does the place from which the wash transactions were negotiated assist JDH. JDH argues that its Senior Vice President, Aaron Reid, negotiated the wash transactions for JDH by "by email and telephone from Nebraska" on "dozens of occasions." (Reid Aff., Filing No. 25-9 ¶ 2-3.) It is well established, however, that the "use of arteries of interstate mail, telephone, railway and banking facilities is insufficient, standing alone, to satisfy due process." *Wells Dairy*, 607 F.3d at 519 (quoting *Mountaire Feeds*, 677 F.2d at 656).

## II.   Credit Applications

JDH argues that the Court did not view the credit applications that Trans Coastal submitted before and during the parties' business relationship in a light most favorable to JDH. Specifically, JDH suggests the Court erred when it concluded that there was no evidence Trans Coastal knew the credit applications would be processed in Nebraska. (JDH Br., Filing No. 36 at 2.) In *Wells Dairy*, the Eighth Circuit found that jurisdiction was appropriate over a defendant that sought and applied for credit from an Iowa company as a precursor to its ongoing business relationship with the plaintiff. *Wells Dairy*, 702 F.3d at 520. However, application for and use of credit does not always support jurisdiction. *See Dairy Farmers*, 702 F.3d at 479. In *Dairy Farmers*, the defendant sought and received credit from a plaintiff in Missouri knowing that the plaintiff had a Missouri headquarters. *Id.* at 479, 479. Nevertheless, the Eighth Circuit concluded that nothing in the defendant's contract to purchase on credit a product that was manufactured outside the forum, and to be delivered outside the forum, alerted the

---

the "Contracts" were originally negotiated or executed are in dispute. JDH apparently argues these statements are incorrect because of the relationship of the wash transactions to Nebraska.

defendant "that it should reasonably anticipate being haled into court on that contract in Missouri." *Id.* at 479.

This Court concluded in its previous Memorandum and Order that nothing in the credit applications alerted Trans Coastal that it should reasonably anticipate being haled to Court in Nebraska. JDH argues that, in spite of statements on the credit applications that the applications would be processed in California (Trans Coastal Credit App., Filing No. 25-3 at ECF 1, 2, 3), the Court misinterpreted evidence that the applications would actually be processed in Nebraska. As discussed above, however, even if Trans Coastal became aware that its applications were being processed in Nebraska, the location where the applications were processed was relevant only to JDH's contacts with Nebraska, not Trans Coastal's. *See Dairy Farmers*, 702 F.3d at 478 (concluding that jurisdiction was improper even though defendant knew that plaintiff determined product price, processed purchase orders, generated invoices, processed payments, coordinated inventory, and administered the preparation of shipping documents in the forum state).

In a similar case involving Trans Coastal, a different judge of this Court recently rejected an argument that personal jurisdiction was proper in Nebraska where Trans Coastal applied for credit from a Nebraska company, sent its financial documentation to Nebraska, and sent payment to Nebraska. *Gavilon Ingredients, LLC v. Trans Coastal Supply Company, Inc.*, 8:14cv399, Memorandum and Order, ECF Filing No. 22 at 4 (D. Neb. April 8, 2015) (Gerrard, J.) Judge Gerrard reasoned that "Trans Coastal's contacts were not with Nebraska—they were with [the plaintiff]." *Id.* at 6. Similarly, although Trans Coastal communicated with JDH about the credit applications, the

12

communications did not alert Trans Coastal that it could reasonably anticipate being haled to Court in Nebraska.

## CONCLUSION

Evidence of the wash transactions and credit applications, viewed most favorably to JDH, does not demonstrate that Trans Coastal reasonably could have anticipated being haled to court in Nebraska.

Accordingly,

IT IS ORDERED: the Motion to Alter or Amend Judgment (Filing No. 33) filed by Plaintiff J.D. Heiskel Holdings, LLC is denied.

Dated this 28th day of April, 2015.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge